UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| EMMANUEL WILLIAM NYUON, <br><br> Movant, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | 4:16-CV-04010-KES <br><br> REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is pending before the court on movant Emmanuel Nyuon's *pro se* motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Pending is a motion to dismiss by the respondent the United States ("government").  See Docket No. 13.  This matter was referred to this magistrate judge pursuant to the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge, and 28 U.S.C. § 636(b)(1)(A) & (B).

**FACTS**

**A.    Pretrial Proceedings**

Mr. Nyuon was indicted by a grand jury on February 7, 2012, on a single count of sex trafficking of a child in violation of 18 U.S.C. §§ 2(a) & (b), 1591(a)(1) & (2), 1591(b)(1) and (2), and 1591(c).  See United States v. Nyuon, CR 12-40017 (hereinafter "CR"), Docket No. 3 (D.S.D. Feb. 7, 2012).  He made his initial appearance in court on the indictment on February 17, 2012, at which time the court appointed attorney Patrick Schroeder to represent

Mr. Nyuon.  See CR Docket No. 10.  Approximately one month later, Mr. Schroeder moved to withdraw from the representation, stating that Mr. Nyuon did not trust him, thought he was working for the prosecution, and that the attorney-client relationship had irreparably broken down.  See CR Docket No. 16.

The court granted Mr. Schroeder's motion to withdraw on March 30, 2012, and appointed attorney Michael J. Butler to represent Mr. Nyuon.  See CR Docket Entry Immediately Following Docket No. 16.  Mr. Butler moved to continue the dates in the court's scheduling order to allow him to obtain discovery from the government and familiarize himself with Mr. Nyuon's case. See CR Docket No. 17.  The motion was granted and Mr. Nyuon's jury trial date was continued from April 24, 2012, to June 26, 2012.  See CR Docket No. 18.

Mr. Butler moved the court *ex parte* for the appointment of a private investigator and for a computer expert.  See CR Docket Nos. 20 & 21.  The court granted those motions.  See CR Docket Entry Immediately Following Docket No. 21.  Mr. Butler moved the court for a funeral furlough to allow Mr. Nyuon to attend the funeral of his sister who died in a car accident; the government opposed the motion.  See CR Docket Nos. 24 & 25.  The court denied the motion, citing Mr. Nyuon's extensive criminal history.  See CR Docket No. 26.

On May 9, 2012, Mr. Butler filed a second motion to continue the dates in the scheduling order, explaining he had received over 1,200 documents in discovery and over 45 audio/video CDs from the government.  See CR Docket

2

No. 27.  The court granted the motion, establishing August 21, 2012, as the new date for Mr. Nyuon's trial.  See CR Docket No. 28.  The order required that any hearing on a motion to suppress must be held prior to July 20, 2012.  Id.

Mr. Butler then filed a motion to suppress statements Mr. Nyuon made to law enforcement following his arrest.  See CR Docket No. 29.  An evidentiary hearing was scheduled on the motion for July 19, 2012.  Mr. Butler made a third motion to continue the scheduling deadlines, explaining that he had two jury trials scheduled in state court for the week of July 19 and could not meet the July 20 suppression hearing deadline established by the court.  See CR Docket No. 32.  The court granted the motion, moving Mr. Nyuon's jury trial to November 13, 2012.  See CR Docket No. 33.  The evidentiary hearing on the suppression motion was then moved to October 4, 2012.  See CR Docket Entry Following Two Entries after Docket No. 33.

On July 16, 2012, Mr. Nyuon filed a *pro se* motion to remove Mr. Butler as his lawyer, complaining that Mr. Butler had moved to continue his trial and stating Mr. Nyuon's opinion that Mr. Butler had already had adequate time to prepare to try his case.  See CR Docket No. 34.  Mr. Nyuon asserted the fact that Mr. Butler was not prepared to go forward with the trial evidenced, in Mr. Nyuon's opinion, a lack of vigorous representation by Mr. Butler on his behalf.  Id.  Mr. Nyuon specifically asserted his right to a speedy trial.  Id.

Mr. Butler joined in the motion by filing his own motion to withdraw two days later.  See CR Docket No. 35.  Mr. Butler explained that the private investigator was experiencing difficulty locating and interviewing material

3

witnesses, that the discovery in the case was voluminous, and that Mr. Nyuon called his office daily requesting in-person visits at the jail.  <u>See</u> CR Docket No. 36-1.  A hearing was held on both *ex parte* motions and the magistrate judge denied the motions.  <u>See</u> CR Docket Entry Immediately Following Docket No. 37.

Mr. Nyuon appealed the ruling to the district court, repeating his allegations that he disagreed with continuing his jury trial and that he thought Mr. Butler had had adequate time to prepare his case.  <u>See</u> CR Docket No. 43. The district judge granted Mr. Nyuon's request for new counsel, discharging Mr. Butler and appointing attorney James Eirinberg as Mr. Nyuon's new lawyer.  <u>See</u> CR Docket No. 46.  The first official act Mr. Eirinberg undertook on Mr. Nyuon's behalf was to move to continue all deadlines in the court's scheduling order.  <u>See</u>  CR Docket No. 51.  Mr. Nyuon filed a waiver of his rights under the Speedy Trial Act, consenting to the continuance.  <u>See</u> CR Docket No. 52.  The motion was granted and December 18, 2012, was set as the new trial date.  <u>See</u> CR Docket No. 54.

Mr. Nyuon filed his own *pro se* motion to compel the government to disclose certain discovery.  <u>See</u> CR Docket No. 56.  That motion was denied. <u>See</u> CR Docket No. 57.

On November 6, 2012, the government filed a superseding indictment adding a co-defendant, Mohammed Sharif Alaboudi.  <u>See</u> CR Docket No. 61. The indictment charged Mr. Nyuon with the same offense as the original indictment and added a charge of conspiracy to engage in sex trafficking of a

child.  Id.  In addition to the conspiracy charge, co-defendant Alaboudi was charged with a separate count of sex trafficking a different child victim.  Id.

On November 8, 2012, an evidentiary hearing was held on Mr. Nyuon's motion to suppress.  On November 29, 2012, the magistrate judge issued a report recommending that the motion be denied.  See CR Docket No. 81.  The district court adopted that recommendation and denied the motion to suppress.  See CR Docket No. 88.

Mr. Eirinberg filed a motion seeking dismissal of the indictment or, in the alternative, severance of his trial from Alaboudi's trial and severance of the counts.  See CR Docket No. 83.  The government opposed the motion.  See CR Docket No. 86.  Mr. Nyuon filed his own *pro se* pleading in favor of the motion.  See CR Docket No. 95.  The court denied this motion in its entirety.  See CR Docket No. 94.  Co-defendant Alaboudi filed a motion to continue the trial date.  See CR Docket No. 96.  The court granted that motion, setting a new trial date of April 2, 2013.  See CR Docket No. 99.

Mr. Eirinberg filed a motion for Mr. Nyuon's release on bond pending trial.  See CR Docket No. 91.  That motion was denied.  See CR Docket No. 92.

On February 13, 2013, Mr. Eirinberg filed a second motion to suppress information obtained from Mr. Nyuon's cell phone.  See CR Docket No. 102.  An evidentiary hearing was scheduled on the motion for February 26, 2013.  See CR Docket Entry Following Two Entries after Docket No. 104.  Mr. Eirinberg moved to continue the date for the hearing by two days due to an appeal previously scheduled in one of Mr. Eirinberg's other cases.  See CR Docket No.

111.  That motion was granted and the hearing rescheduled for February 28.
<u>See</u> CR Docket Entry Immediately Following Docket No. 111.  The magistrate
judge issued a report recommending denial of the motion.  <u>See</u> CR Docket No.
124.  Mr. Eirinberg objected.  <u>See</u> CR Docket No. 159.  The district court
sustained some of the objections as to factual matters, but overruled the
remaining objections, adopted the remainder of the report and
recommendation, and denied the motion to suppress.  <u>See</u> CR Docket No. 175.

A second superseding indictment was issued on March 6, 2013.  <u>See</u> CR
Docket No. 119.  This indictment did not change any of the allegations against
Mr. Nyuon, but did assert a new count of sex trafficking by fraud, force or
coercion against Alaboudi.  <u>Id.</u> Mr. Eirinberg again moved to dismiss the
second superseding indictment or, in the alternative, to sever co-defendant
Alaboudi and to sever counts.  <u>See</u> CR Docket No. 127.   The government again
opposed the motion.  <u>See</u> CR Docket No. 128.  This time, the court granted the
motion to sever Mr. Nyuon's trial from that of co-defendant Alaboudi, but
denied the motion to dismiss.  <u>See</u> CR Docket No. 129.

In the weeks before trial, Mr. Eirinberg filed motions for writs of habeas
corpus ad testificandum for various witnesses, for disclosure of inducements
offered by the government to witnesses, and for disclosure of impeachment
information.  <u>See</u> CR Docket Nos. 131-32, 143-44.  Mr. Eirinberg also filed
numerous motions *in limine*, a motion for additional peremptory challenges, a
motion to allow counsel to personally *voir dire* the jury, and a motion for
disclosure from the government of any research it had as to potential jurors.

6

See CR Docket Nos. 143-51, 169.  He also filed an emergency motion for testing of Mr. Nyuon for sexually transmitted disease.  See CR Docket No. 168. Mr. Eirinberg also filed a motion for an arrest warrant for A.T., a material witness who stayed in a motel room with the alleged victim.  See CR Docket No. 181.  The court granted the motion.  See CR Docket No. 183.

**B.    The Jury Trial**

Mr. Nyuon's jury trial began on April 2, 2013.  See CR Docket No. 213 at p. 7 (Jury Trial Transcript "JT").  The government's first witness was Jason Statom, an employee of Backpage.com.  Id.  In order to post an ad on Backpage.com, the advertiser must have a valid email address.  Id. at 9-10. When someone tries to post an ad, a verification is sent to the email provided. Id.  In order for the ad to actually post, the link in the email from Backpage.com must be clicked.  Id.  If no valid email address is provided, the ad will never be posted.  Id.

Statom explained that Backpage.com employs "moderators" who review advertisements placed on its website.  Id. at pp. 10-12.  If a moderator suspects a child is involved in a sex ad, he will forward the link to the ad to the National Center for Missing and Exploited Children (NCMEC).  Id. at 12.  Backpage.com made such a referral to NCMEC in this case.  Id. at 12-13.  The referral was for three ads placed by Mr. Nyuon on Backpage.com.  Id. at 13-22.  The ads contained text as well as photos.  Id.  One of the ads was associated with the email address KCLoc@hotmail.com.  Id. at p. 22.  Mr. Statom made the referral because the photographs appeared to depict a girl who was under the age of

7

majority.  Id. at p. 23.  On cross-examination, Mr. Eirinberg brought out information that the email address associated with the ads featured someone's name other than Mr. Nyuon's and that Backpage.com does nothing to verify the name on the account was really Mr. Nyuon.  Id. at pp. 23-25.

The government's next witness was Charla Aramayo, a Special Agent with the Department of Homeland Security.  Id. at pp. 25-26.  Agent Aramayo became involved in this investigation when the Sioux Falls Police Department approached her with information about prostitution in the Sioux Falls area involving a 14-year old girl named S.J.  Id. at pp. 27-28.  Agent Aramayo investigated and found photos of S.J. from Facebook that were identical to the photos used in the Backpage.com ads.  Id. at pp. 28-31.  The Facebook page where S.J.'s photos were found was listed as a friend on Mr. Nyuon's Facebook page.  Id. at pp. 31-32.  The Facebook account revealed that Mr. Nyuon referred to himself in some photographs posted there as "KC Loc."  Id. at p. 34.

Agent Aramayo obtained information about the email account KCLoc@hotmail.com which had been associated with one of the Backpage.com ads.  Id. at pp. 34-38.  That information revealed that the email account had received verifying emails from Backpage.com for the ads previously discussed.  Id. at p. 38.  Agent Aramayo also discovered that the photos from the Backpage.com ads had been sent to the KCLoc email address from a specific phone number.  Id. at pp. 38-43.  An inquiry to Facebook revealed S.J.'s name associated with the Facebook account from which the Backpage.com photos had been taken.  Id. at p. 44.  Agent Aramayo then asked the Sioux Falls Police

Department to run the girl's name through their database.  Id. at p. 49.  The

police reported back to Agent Aramayo that the name was associated with a

14-year-old girl from the Sioux Falls area.  Id.

Agent Aramayo decided to conduct a sting operation to approach S.J. in

a situation where she could not deny she was engaged in prostitution; the sting

operation was set for January 25, 2012, in Sioux Falls.  Id.  The sting operation

was successful.  Id. at p. 50.

On cross-examination, Mr. Eirinberg established that Agent Aramayo

could not testify for sure who was posting or receiving the photos that

appeared in the Backpage.com ads or the emails associated with the ads.  Id.

at pp. 50-52.

The government's next witness was Sioux Falls Police Officer Brad Smidt.

Id. at p. 52.  Officer Smidt was involved in the investigation of the

Backpage.com ads involving S.J.  Id. at pp. 53-56.  Officer Smidt posed as a

customer of S.J. in order to make contact with her.  Id. at p. 56.  He called the

phone number listed in the Backpage.com ad and made audio recordings of the

calls.  Id. at pp. 56-57.  A female answered the phone, identifying herself as

"Katie," the name associated with the Backpage.com ad.  Id. at pp. 57-59.

Recordings of the phone calls Officer Smidt made were played for the jury.  Id.

After a number of live phone calls were exchanged, Officer Smidt and "Katie"

began texting.  Id. at pp. 59-62.  "Katie" agreed to come to Officer Smidt's hotel

room.  Id. at pp. 63-67.

The hotel room was wired for video recording from multiple angles and there were 16 police officers outside the hotel and in the room adjoining Officer Smidt's room.  Id.  "Katie" came to Officer Smidt's room and knocked on the door.  Id. at p. 67.  She matched the appearance of S.J., so Officer Smidt let her into the room.  Id. at p. 68.  The video recording of S.J. and Officer Smidt was played for the jury.  Id. at p. 69.  Once in the room, S.J. identified herself as Destiny Hogan.  Id.  S.J. had two cell phones on her person when she entered Officer Smidt's room; both phones were seized by law enforcement.  Id. at p. 70.  Mr. Eirinberg did not cross-examine Officer Smidt.

The government next called Sioux Falls Police Officer Hector Soto.  Id. at p. 71.  Officer Soto was conducting surveillance outside the hotel when the sting operation involving S.J. was conducted.  Id. at p. 72.  Officer Soto was watching for a vehicle containing S.J. or a vehicle dropping S.J. off at the hotel.  Id. at pp. 74-75.  Officer Soto observed a green sport utility vehicle (SUV) drop S.J. off at the front entrance to the hotel and then park in the hotel parking lot.  Id. at p. 75.  After a bit, the SUV moved to a different parking spot, then it left the parking lot, traveled east on Shirley Avenue and went to a gas station on the corner of Louise Avenue and Shirley.  Id. at pp. 77-78.

Officer Soto followed the SUV and made contact with it at the gas station.  Id. at p. 78.  Officer Soto parked his vehicle at the back of the SUV and another agent parked in front of the SUV and multiple law enforcement officers converged on the SUV from all directions.  Id. at p. 80.  Officer Soto made contact with the driver of the SUV, who was Mr. Nyuon.  Id.

10

Mr. Nyuon provided Officer Soto with an identification card.  Id. at p. 81.
Mr. Nyuon had a cell phone on the dashboard of the SUV directly in front of
the steering wheel that Officer Soto took into custody.  Id.  At the time Officer
Soto seized Mr. Nyuon's phone, there was a text message displayed on it saying
"Do you have condoms?"  Id. at p. 82.  Mr. Eirinberg did not cross-examine
Officer Soto.

At this point, the prosecutor was unprepared to call his next witness and
asked for a couple of minutes, which the court gave him.  Id. at 83.  The
government then called Sioux Falls Police Officer Sean Kooistra.  Id.  Officer
Kooistra was responsible for obtaining data off the two cell phones seized from
S.J. and the cell phone seized from Mr. Nyuon.  Id. at pp. 83-84.  Officer
Kooistra testified he retrieved data off all three phones, burned the data to a
CD and turned the CD over to Agent Aramayo.  Id. at pp. 84-88.  Mr. Eirinberg
established through cross-examination that Officer Kooistra made no attempt
to determine ownership of the three phones or to analyze the data retrieved
from the phones.  Id. at pp. 88-90.

The government's next witness was Gretchen Slate, a Special Agent with
the South Dakota Division of Criminal Investigation.  Id. at pp. 91-92.  Agent
Slate was involved in an investigation of co-defendant Alaboudi and helped
execute a search warrant at his house.  Id. at p. 92.

Agent Slate testified she took the data from S.J.'s cell phone and was
able to contact 13 persons who had contacted S.J. on her cell phone and
admitted to having commercial sex acts with S.J. as a result of the

Backpage.com ad.  Id. at pp. 100-02.  Agent Slate identified one of the 13 customers as Nima Tamang, also known by the name Robin.  Id. at p. 102.

Agent Slate also participated in the sting operation at the hotel involving S.J.  Id. at p. 103.  Agent Slate attempted to visit with S.J. the night of the sting, but S.J. was very angry and defiant and did not want to talk to Agent Slate.  Id.

Mr. Eirinberg established through cross-examination that Mr. Nyuon was not present at co-defendant Alaboudi's house when the search warrant was executed there.  Id. at p. 105.  He also established that no property belonging to Mr. Nyuon was found in Alaboudi's home.  Id.

The government's next witness was Amanda French, an employee of the property management company Ronning Companies.  Id. at pp. 105-06. French testified that Mr. Nyuon rented an apartment at the River Glen complex from Ronning Companies.  Id. at pp. 106-07. She identified a photograph of S.J. as a girl that was living with Mr. Nyuon in his apartment in the summer of 2011 until he was evicted in December 2011 or January 2012.  Id. at pp. 107-09.  Mr. Eirinberg established through cross-examination that neither Mr. Nyuon nor S.J. were on the lease with Ronning Companies.  Id. at pp. 110-11.  Mr. Eirinberg established that Ms. French did not know if S.J. spent the night in the apartment, but she did testify she saw S.J. at the apartment multiple times at varying times of day.  Id.  Ms. French testified she never observed any illegal activity going on at the apartment.  Id.

The next witness who testified for the government was S.J.  Id. at p. 112.  S.J. testified she was 15 years old.  Id.  The prosecutor asked S.J. to talk about her family life growing up.  Id.  Mr. Eirinberg objected several times; then he asked for and received a standing objection.  Id.  S.J. said she grew up with her mom, her dad, and her older half-brother.  Id. at pp. 112-15.  Her dad was not around much because he was an alcoholic and sometimes stayed with relatives, went to prison twice, and lived in California for a time.  Id.  Then, when S.J. was 12 her father was in a bar fight that left him unable to talk or walk or anything.  Id. at p. 115.  Eventually, her dad was moved to Iowa and S.J. was only able to see him once or twice a month.  Id. at pp. 115-16.

In the aftermath of her dad's accident, S.J. was alone a lot.  Id. at p. 117.  Her brother turned to his biological father and her mom worked a lot to try to pay off her dad's hospital bills.  Id.  She started skipping school and ended up getting expelled for truancy.  Id. at pp. 118-19.  S.J. also testified very briefly that she had been sexually abused in her home by someone from outside her immediate family.  Id.

S.J. testified she met Mr. Nyuon, who called himself "K.C.," in September 2011 right before she turned 14.  Id. at p. 119.  At that time, Mr. Nyuon gave S.J. his phone number and told her, "call me if you want to party."  Id. at p. 121.  Approximately three weeks later, S.J. and her friend called Mr. Nyuon. Id.  He came to their location and picked them up.  Id. at p. 122.  He took them to a barbeque at some apartments on the east side of Sioux Falls.  Id. at p. 123.

The third time S.J. and Mr. Nyuon spent time together, Mr. Nyuon took her to co-defendant Alaboudi's apartment.  Id. at pp. 123-24.  S.J.'s impression of Alaboudi was "very creepy, scary, ugly."  Id. at pp. 124-25.

The next time she spent time with Mr. Nyuon, he took her to his apartment.  Id. at p. 129.  The two talked about an ex-boyfriend of S.J.'s whom Mr. Nyuon did not like and was making fun of.  Id. at p. 130.  At one point, Mr. Nyuon left the living room to enter his bedroom; when he came back, he had a small black handgun with a laser sight on it.  Id.  Seeing Mr. Nyuon with a gun made S.J. look at him differently; she was scared of him.  Id. at p. 131, 133.  After the gun incident, Mr. Nyuon asked S.J. to take some little baggies of drugs and give them to a guy waiting outside the apartment; he told S.J. to be sure to collect the $40 from the guy before handing over the drugs.  Id. at p. 131.  Mr. Nyuon called this transaction a "hustle."  Id. at p. 132.  Later that night, the two had sex for the first time.  Id. at p. 131.

A few weeks later, S.J. told Mr. Nyuon she wanted to smoke some marijuana.  Id. at p. 134.  Mr. Nyuon picked her up and took her to Alaboudi's house.  Id.  Alaboudi talked to S.J. about some guys who had some money and asked her about doing a "hustle."  Id. at pp. 134-36.  S.J. thought he was talking about a drug deal.  Id.  At some point, Alaboudi pulled Mr. Nyuon and S.J. into his bedroom and the two men talked about it, with Alaboudi telling Mr. Nyuon that S.J. was "down to do it," that she had said "yeah."  Id. at p. 137.

14

Mr. Nyuon then pulled S.J. into Alaboudi's bedroom and had sex with her. Id. at pp. 137-38. She was leaving the bedroom afterward, and there were two guys coming up the steps. Id. at p. 138. Mr. Nyuon told her the men were here and he handed her two condoms. Id. When S.J. realized what that meant, she became very upset with Mr. Nyuon because she thought they were in a relationship. Id. at p. 139. Alaboudi began talking with the two men and then started beating them with a wooden stick because they did not have the money they were supposed to have. Id. at pp. 139-40.

Another time a man named Robin picked S.J. up in his minivan. Id. at pp. 140-46. Inside the vehicle were Robin's friend, Alaboudi, and Mr. Nyuon. Id. S.J. knew when she was picked up that she was going to have sex with Robin and his friend for money. Id. She was driven to Alaboudi's house where she was taken to the bedroom. Id. Alaboudi told the men they were not allowed to remove the condoms; he then left the room. Id. S.J. then collected the money from the two men and had sex with them, one at a time. Id. Afterward, Mr. Nyuon directed S.J. to split up the money between herself, himself, and Alaboudi. Id.

Another time Mr. Nyuon arranged for S.J. to engage in a commercial sex act with Robin and two other men at Mr. Nyuon's apartment. Id. at pp. 146-49. Sometime after this, S.J. learned that Mr. Nyuon had created an ad on Backpage.com using some photos from S.J.'s Facebook page that she had sent him. Id. at pp. 149-51. She did not know that Mr. Nyuon had used her photos to create the Backpage.com ad. Id. At one point, she created her own

15

Backpage.com ad using a friend's credit card so she would not have to split the money with Mr. Nyuon.  Id.  She never received any calls on her own ad, however.  Id.

In January, 2012, S.J. ran away from home.  Id. at p. 152.  She had stayed out all night partying and did not want to go home to her mother to face the consequences.  Id.  She had no money, no clothes, no toothbrush, and no car.  Id. at pp. 152-54.  She ended up living with Mr. Nyuon at a hotel room with Mr. Nyuon's "baby mama," Amber Traversie.  Id.  Mr. Nyuon, using the Backpage.com ad, started arranging commercial sex acts with men and S.J. at the hotel room.  Id. at pp. 155-56.  Additional commercial sex acts also occurred with Robin and his friends.  Id. at pp. 157-60.  After S.J. started living with Mr. Nyuon, Mr. Nyuon kept all the money from the commercial sex transactions.  Id.

During early 2012, S.J. was sick to her stomach a lot and often worried that she was pregnant.  Id. at pp. 160-62.  At one point Mr. Nyuon took S.J. to Alaboudi's house so that Alaboudi could have sex with her.  Id.  S.J. told Alaboudi "no," but he raped her anyway.  Id. at pp. 162-63.  S.J. felt she had no choice in the commercial sex transactions that occurred.  Id.

S.J. testified that, in addition to the handgun, Mr. Nyuon had a taser. Id. at p. 166.  Mr. Nyuon threatened S.J. with the taser when she did not have any money from prostituting or thought she had been hanging out with other guys; he also threatened other people with the taser.  Id. at pp. 166-67.  He also threatened to kick S.J. out, threatened to slap her and hit her.  Id.  He

16

threatened a man at a bar with his handgun.  Id. at p. 167.  He beat S.J. once after three days passed without her bringing in any money.  Id.  He would also pull S.J.'s nose.  Id. at p. 168.  These pulls resulted in bloody noses, bruises, and once a tear in her skin on the side of her nose.  Id.

The day of the sting operation, January 25, 2012, S.J. was ill and had fainted in the shower that morning.  Id. at pp. 168-69.  S.J. was hesitant to do business with the officer who called her because the man asked S.J. to come to his hotel whereas S.J. was used to having her customers come to her hotel.  Id. at pp. 170-71.  Also, the man claimed to be from out of town, but his phone had a Sioux Falls area code.  Id.  Mr. Nyuon decided S.J. should accept the job because they needed the money to move to a new motel.  Id.

After her arrest, it was determined that S.J. had a sexually transmitted disease, chlamydia, that had caused pelvic inflammatory disease and was causing her to throw up all the time.  Id. at pp. 172-74.  She was hospitalized for several days to treat the chlamydia and to treat the pain from that condition.  Id.

On cross-examination, Mr. Eirinberg established that, prior to her arrest, S.J. lied about her age and told people she was between 18 and 21 years of age.  Id. at p. 196.  She perpetuated this lie on the Backpage.com ad she placed herself.  Id. at p. 199.  She admitted that she never told Mr. Nyuon her true age and, in fact, told him she had dropped out of school when she was 18. Id. at p. 204.  She told Mr. Nyuon when she met him she was studying to take the General Equivalency Exam (GED) in June.  Id. at p. 204.

Mr. Eirinberg also established that S.J. told a forensic interviewer that no one made her engage in prostitution, she did it for herself.  Id. at pp. 196-97.  Mr. Eirinberg established that S.J. probably told the interviewer that Mr. Nyuon was nice to her.  Id. at p. 197.  S.J. testified on cross-examination that she lied constantly to the police at first, then later started telling the truth, but that she could not remember when she started telling the truth.  Id. at pp. 197-98, 203-04.  S.J. admitted to Mr. Eirinberg that she was in a relationship with C.N. at the same time she was dating Mr. Nyuon.  Id. at p. 200.  S.J. admitted after she ran away from home on January 6, 2012, and began living with Mr. Nyuon that he never stopped her from returning home to her mother's house.  Id. at p. 216.

On the second day of the jury trial, the government called Nikki Track as a witness.  See CR Docket No. 214 at p. 2.[1]  Nikki was a homeless person whom Mr. Nyuon picked up off the street.  She subsequently performed commercial sex acts for Mr. Nyuon, splitting the money with him.  Id. at pp. 2-12.  Nikki testified Mr. Nyuon was violent with her on two occasions, pushing her once and slapping her once.  Id.  Nikki was in her 20s.  Id.

Nikki was at Alaboudi's home when Mr. Nyuon brought S.J. over to Alaboudi for the purpose of allowing Alaboudi to engage in sex with S.J.  Id. at

---

[1] The Jury Trial Transcript was filed at two docket numbers in Mr. Nyuon's criminal case; Volume I was filed at Docket No. 213 and Volume II at Docket No. 214.  Although the page numbers of the transcript itself are continuous, the page number assigned by the court's electronic docketing software start over at page 1 in Volume II at Docket No. 214.  In this opinion, the court cites to the page number in the court's electronic docket rather than the transcript page number, for ease of looking up the references in the court's record.

pp. 10-12.  Nikki also saw Mr. Nyuon bring S.J. over to Alaboudi's house one other time just to smoke.  Id.  S.J. was wearing the exact same clothes, shoes, and coat both times Nikki saw her at Alaboudi's house.  Id.  S.J. said she was 18, but Nikki thought she looked far younger than 18.  Id.

Mr. Eirinberg established on cross-examination that Nikki was huffing hairspray heavily during the time frames she had testified about and that her memory was bad for that reason.  Id. at pp. 13-22.  Mr. Eirinberg also established that at the time of her testimony, Nikki was subject to state court drug charges and she hoped she would receive favorable treatment on those charges by testifying against Mr. Nyuon.  Id.

The government next called Tiffany Frazier.  Id. at p. 22.  Tiffany met Mr. Nyuon in the summer of 2011 in the house of a mutual friend where she, Mr. Nyuon, Amber, and the friend smoked marijuana.  Id. at pp. 23-24.  Later, she came to spend more time with Mr. Nyuon and observed that Amber was answering calls for commercial sex acts for Mr. Nyuon.  Id. at pp. 24-25.  When she met Mr. Nyuon, Tiffany was homeless and had no money, personal effects, car, or clothes.  Id. at p. 26.  She was using marijuana and methamphetamine at that time.  Id.  Ultimately, Tiffany performed commercial sex acts for Mr. Nyuon that he set up.  Id.  These took place at a hotel and at Alaboudi's house.  Id. at pp. 26-27.  Mr. Nyuon kept the money he received as a result of Tiffany's sex acts.  Id. at p. 28.

Tiffany testified Mr. Nyuon scared her into performing prostitution acts, showing her a black loaded gun before she went to one of her commercial sex

assignations at a hotel.  Id. at p. 45.   Mr. Nyuon stayed in the bathroom of the

hotel room while Tiffany performed the sex act.  Id.  She was afraid if her

customer got mad, Mr. Nyuon would hear and come out of the bathroom.  Id.

Mr. Eirinberg established that Tiffany was addicted to

methamphetamine, marijuana, Hydrocodone, and OxyContin at the times she

testified about.  Id. at p. 38.  He also established that Tiffany had received a

"proffer letter" from the government and hoped to escape prosecution by

testifying against Mr. Nyuon, Alaboudi, and a person named Clinton.  Id. at

pp. 32-34.  Mr. Eirinberg also established that Tiffany was a convicted felon.

Id. at p. 34.  Mr. Eirinberg also established through cross-examination that

Tiffany had debriefed with law enforcement on numerous occasions.  Id. at pp.

35-36, 41-45.  Mr. Eirinberg established that Tiffany did not know S.J. and

had never seen her.  Id. at p. 47.  Finally, Mr. Eirinberg established that Tiffany

also performed commercial sex acts on behalf of four other individuals who

assisted her in prostituting herself.  Id. at p. 50.

The government's next witness was Amber Poulson, fka Amber Traversie.

Id. at p. 51.  Amber testified she met Mr. Nyuon for the first time in July, 2011,

in Sioux Falls, through her cousin, Nikki Track.  Id. at pp. 52, 65.  Amber is

the mother of Mr. Nyuon's baby.  Id. at pp. 52-53.  She has Mr. Nyuon's name

tattooed on her shoulder and visited Mr. Nyuon at the jail in the months

leading up to the trial.  Id. at pp. 53-54.  She was a reluctant witness,

appearing via a subpoena.  Id.  Amber testified Mr. Nyuon was her boyfriend at

one time, they lived together for a time, and that she still cared about him.  Id.

at pp. 54-55.  Amber testified Mr. Nyuon made a living selling drugs and selling girls as a pimp.  Id. at pp. 55-56.  Amber testified Mr. Nyuon had a black pellet gun that looked like a real handgun and a "zapper."  Id. at pp. 56-59.

Amber testified she knew S.J. through Mr. Nyuon.  Id. at p. 59-60.  Amber came to find out S.J. was one of Mr. Nyuon's prostitutes.  Id. at p. 60.  She testified she saw S. J. at hotel rooms that she, Mr. Nyuon and S.J. stayed in together.  Id.  When Amber saw S.J., she was sick, throwing up.  Id.

Amber testified she knew Alaboudi, that she understood Mr. Nyuon and Alaboudi were in a prostitution partnership, and that Alaboudi's house was the prostitution house.  Id. at pp. 62-63.  Amber testified she and Mr. Nyuon were at Alaboudi's house one time when S.J. was in the bedroom performing a commercial sex act.  Id. at pp. 63-64.  S.J. came out of the room, complaining that the customer was refusing to wear a condom.  Id.  Mr. Nyuon and Alaboudi went into the bedroom and told the man he had to wear a condom.  Id.  Amber testified she set up the email account Mr. Nyuon used in the Backpage.com ads.  Id. at p. 76.

Mr. Eirinberg established through cross-examination that Amber had cooperated with law enforcement by meeting with them 3-4 times.  Id. at p. 67.  Mr. Eirinberg established that the case agent, Charla Aramayo, came to talk to Amber and when she refused, Agent Aramayo said the next time she contacted Amber she would have an arrest warrant charging her with the same offenses as Mr. Nyuon.  Id. at p. 71.  Agent Aramayo told Amber she would be going to jail and not getting out.  Id.  Agent Aramayo agent told Amber she would not

see her kids for a long time if she did not agree to talk to law enforcement.  Id. at p. 72.  Mr. Eirinberg established that Amber felt if she did not tell law enforcement what they wanted to hear about Mr. Nyuon she herself would be arrested.  Id. at p. 73.

Mr. Eirinberg established that S.J. told Amber she was 25 years old.  Id. at p. 69.  Later, she told Amber she was 18.  Id.  Amber testified that S.J. appeared to be 18 years old or older according to her.  Id.

Amber told Mr. Eirinberg that Mr. Nyuon never threatened her and she never saw him threaten S.J.  Id. at p. 75.  She testified Mr. Nyuon never used the zapper on anyone, though once he accidentally shocked himself with it.  Id. at p. 77.  She testified she never saw Mr. Nyuon hit anyone.  Id. at p. 78.  On redirect, Amber admitted Mr. Nyuon pulled her hair once.  Id. at 79.

The government then recalled Special Agent Aramayo to testify.  Id. at p. 86.  Agent Aramayo interviewed Mr. Nyuon after the sting operation on January 25, 2012.  Id. at pp. 86-88.  Mr. Nyuon denied being a pimp, but stated he knew S.J. was a prostitute, that he had taken her in the past to meet prostitution dates, and that he had received money from those commercial sex acts.  Id.  Mr. Nyuon told Agent Aramayo that he took S.J. to the hotel on the night of the sting operation because she asked him for a ride.  Id. at p. 88.  Mr. Nyuon admitted he knew S.J. was going to the hotel for a date to perform a commercial sex act.  Id.  Mr. Nyuon told Agent Aramayo he expected to receive $20 in exchange for giving S.J. a ride.  Id. at pp. 88-89.  Mr. Nyuon stated that in the past he had received "gas money" and beer in exchange for giving S.J.

rides to her dates.  Id.  Agent Aramayo's January 25 interview with Mr. Nyuon was video recorded; an excerpt of that recording was played for the jury.  Id. at pp. 91-92.

Agent Aramayo testified she reviewed data from the three cell phones seized on January 25:  the two cell phones S.J. carried with her and Mr. Nyuon's cell phone which was in the SUV with him.  Id. at p. 93.  When S.J. was preparing to go to the date that was actually the sting operation on January 25, Mr. Nyuon texted her and asked if she had condoms.  Id. at pp. 93, 113-14.

Agent Aramayo also subpoenaed records from various motels that showed Mr. Nyuon rented rooms there consistent with S.J.'s testimony.  Id. at pp. 94-102.  Agent Aramayo testified she subpoenaed bank records which verified that three of the Backpage.com ads which advertised S.J. were paid for with a credit card owned by Mr. Nyuon.  Id. at pp. 101-03.

During cross-examination, Mr. Eirinberg elicited information from Agent Aramayo that she had lied to Mr. Nyuon when she interviewed him.  Id. at pp. 110-11.  Agent Aramayo falsely told Mr. Nyuon in the interrogation that S.J. had cooperated with law enforcement by talking to them and that S.J. told them Mr. Nyuon was her pimp.  Id.  In fact, S.J. had refused to talk to law enforcement on January 25.  Id.  Mr. Eirinberg also elicited testimony from Agent Aramayo that Officer Smidt, who was also present at Mr. Nyuon's interview, lied to Mr. Nyuon.  Id. at p. 111.  Officer Smidt falsely told Mr. Nyuon, "The thing is, we haven't lied to you tonight."  Id.  Agent Aramayo

admitted on cross-examination that when she first made contact with Mr. Nyuon on the evening of January 25 she told him he was under arrest for an outstanding traffic warrant. Id. at p. 118.

Mr. Eirinberg established that when Agent Aramayo interviewed Amber Traversie, she threatened Amber with federal prosecution in order to get her to cooperate. Id. at pp. 121-22. Agent Aramayo admitted telling Amber "you are one of the pieces of this," and "We're all on the same team." Id.

Mr. Eirinberg also drew an admission from Agent Aramayo that the bank records she subpoenaed showed only that Mr. Nyuon's credit card had been used to purchase the Backpage.com ads; she admitted she could not prove that it had been Mr. Nyuon who actually used the card to make the purchases. Id. at p. 112. Agent Aramayo agreed the payments to Backpage.com had been made over the internet. Id. After Agent Aramayo's testimony, the government rested its case-in-chief. Id. at p. 124.

Mr. Eirinberg called Ashley Brower as the first defense witness. Id. at p. 125. Ashley testified she knew Mr. Nyuon for approximately 5 years. Id. at p. 126. Mr. Nyuon visited Ashley's house quite often—3 or 4 times a week— since September, 2011. Id. at p. 127. Ashley met S.J. three times, though she knew her by a different name. Id. at p. 128-29. S.J. told Ashley she was 20 years old and Ashley believed her. Id. When Mr. Nyuon visited Ashley's home, he never consumed drugs and she never saw him in possession of any drugs. Id. at p. 130. Ashley testified she has seen Mr. Nyuon hundreds of times and never saw him ingest drugs or alcohol. Id. at pp. 130-31.

24

Ashley testified she has never seen Mr. Nyuon treat a female badly and had never seen him in possession of a gun or any weapon. Id. at pp. 132-33. Ashely testified she would never have any reason to believe Mr. Nyuon would ever harm anyone. Id. at p. 133. She described his personality as funny, nice, friendly, outgoing, and really easy to get along with and talk to. Id.

Next Mr. Eirinberg called Majok Aluong as a witness. Id. at p. 135. Majok testified he had known Mr. Nyuon for approximately 10 years. Id. at p. 137. Majok testified he had met S.J., though he knew her by a different name. Id. at pp. 137-38. He first met S.J. in the fall of 2011; although Majok never asked S.J. her age, she volunteered that she was over 18 "like about four times." Id. at p. 140. Majok believed her to be over 18. Id. at p. 141.

Majok testified he had never seen Mr. Nyuon consume drugs; he did know Mr. Nyuon to drink alcohol, but not heavily. Id. at pp. 138-39. Majok testified he had never known Mr. Nyuon to be involved in prostitution. Id. at pp. 139, 141. He testified he had never seen Mr. Nyuon be mean to anyone or be angry or impolite. Id. at p. 141.

The last defense witness was Peter Oromo. Id. at p. 145. Mr. Oromo testified he has known Mr. Nyuon for approximately 14-15 years. Id. at p. 146. He would see Mr. Nyuon approximately 2-3 times per week. Id. Mr. Oromo played video games and drank beer with Mr. Nyuon. Id. at pp. 146-47.

Mr. Oromo had met S.J. towards the end of 2011, though he knew her by a different name. Id. at p. 148. When Mr. Oromo met S.J., she was dating a man named Charles Nave. Id. at p. 149. Mr. Oromo testified he has seen S.J.

around 8-9 times.  Id.  Once or twice S.J. was with Mr. Nyuon.  Id.  Mr. Oromo had never seen Mr. Nyuon be mean or disrespectful to a woman or girl.  Id. at p. 150.  He had never seen Mr. Nyuon strike anyone or carry a weapon of any kind, including a pellet gun.  Id. at p. 151.  Mr. Oromo testified the first time he met S.J. she lied about her age and told him she was 18 years old.  Id. Mr. Oromo testified on cross-examination that his girlfriend asked S.J. her age because she looked really young and they did not want to give her alcohol if she was underage.  Id. at p. 152.  Mr. Oromo's girlfriend subsequently found S.J. was in fact not her stated age.  Id. at p. 153.  These events occurred in early January, 2012, sometime after January 6.  Id.  Mr. Oromo never told Mr. Nyuon that his girlfriend discovered S.J. was under 18.  Id. at p. 154.

The jury returned its verdict on April 5, 2013, finding Mr. Nyuon guilty of both sex trafficking of a child and of conspiracy to commit sex trafficking of a child.  See CR Docket No. 196.

## C.    Post-trial, Sentencing and Appeal

Following the trial, Mr. Eirinberg filed a motion for a downward departure from the United States Sentencing Guidelines (USSG) sentencing range and/or a downward variance.  See CR Docket No. 212.  He argued a downward departure was warranted due to Mr. Nyuon's extremely traumatic existence in South Sudan and the severe mental and emotional maltreatment he received at the hands of his stepmother in California.  Id.  He also argued that the correct base offense level for Mr. Nyuon under the USSG was 30, not the 47 stated in the presentence investigation report (PSI).  Id.  Mr. Eirinberg

26

also argued against enhancements applied in the PSI under the USSG for Mr. Nyuon's role in the offense and S.J.'s status as a vulnerable victim.  <u>Id.</u>

The mandatory minimum sentence below which the court was not allowed to impose a sentence was 120 months' imprisonment.  <u>See</u> CR Docket No. 212; CR Docket No. 302 at p. 48.  The maximum penalty was life imprisonment.  <u>See</u> CR Docket No. 302 at p. 48.  The PSI set forth a USSG range of life imprisonment.  <u>See</u> CR Docket No. 212.

The district court sentenced Mr. Nyuon on July 15, 2013.  <u>See</u> CR Docket No. 219.  Key to the defense, the court found that because no special verdict form had been submitted to the jury, the intervening Supreme Court decision in <u>Alleyne v. United States</u> required the court to sustain Mr. Eirinberg's objection to the PSI's assertion of the base offense level; instead, the court found Mr. Eirinberg's position that the base offense level should be 30 was correct.  <u>See</u> CR Docket No. 302 at p. 15 (Sentencing Hearing Transcript).

The court also sustained Mr. Eirinberg's objection to the vulnerable-victim USSG enhancement.  <u>Id.</u> at p. 26.  The court concluded that S.J.'s youth was already taken into account under the elements of the offense, so the court could not consider S.J.'s age to be a factor.  <u>Id.</u> at pp. 25-26.  The court then concluded that S.J. had no physical or mental condition which would have rendered her especially vulnerable.  <u>Id.</u> at p. 26.  Therefore, the enhancement was stricken from the USSG calculation.  <u>Id.</u>

27

After resolving all objections to the PSI, the district court announced that the USSG range for Mr. Nyuon was 360 months' imprisonment up to life based on a total offense level of 41 and a criminal history category of VI. Id. at p. 48. The court denied Mr. Eirinberg's motion for a downward departure under the USSG. Id. at p. 49.

S.J., S.J.'s mom, Tiffany, and Nikki all made brief statements at the hearing. Id. at pp. 51-54.

Mr. Eirinberg offered remarks on Mr. Nyuon's behalf, continuing to urge a downward variance under the factors in 18 U.S.C. § 3553(a). Id. at pp. 55-60. In this regard, Mr. Eirinberg spoke at length about Mr. Nyuon's harsh childhood in Sudan and his history of being sexually, physically, and emotionally abused by siblings and his step-mother. Id. He argued that imposing the mandatory minimum sentence of 10 years was adequate and sufficient to accomplish the sentencing goals of punishment and deterrence. Id. He also emphasized Mr. Nyuon's immediate cooperation with authorities on the night of the sting operation, at least to the extent he admitted aiding and abetting prostitution. Id.

Mr. Nyuon then offered remarks on his own behalf which were largely self-serving and inflammatory. Id. at p. 61. He began by stating he was "glad this whole thing happened," so that S.J., Tiffany and Nikki could get the help they needed to "kick their drug addiction and not [ ] be in this lifestyle and whatnot." Id. He also "apologized" to S.J. for "aiding and abetting or whatnot." Id. He told the district court he was not solely responsible for the girls'

28

participation in prostitution, that they "had something to do with it too" and they were "not just all little angels." Id.  He stated that Tiffany and Nikki ran to him all the time "because [he] was the nice guy and [he] would let them stay with [him] and give them food when they were hungry or whatever." Id.  Mr. Nyuon stated he believed he should not get "life or a long sentence." Id. at p. 62.  He asked the court to "be lenient with [him] and give [him] a minimal sentence." Id.

The court sentenced Mr. Nyuon to 360 months' imprisonment on the sex trafficking conviction and 360 months' imprisonment on the conspiracy count, the sentences on both counts to run concurrently with each other.  See CR Docket No. 221.   Mr. Eirinberg filed a notice of appeal on Mr. Nyuon's behalf on July 19, 2013.  See CR Docket No. 225.

The Eighth Circuit affirmed Mr. Nyuon's conviction and sentence on December 15, 2014.  See United States v. Nyuon, 587 Fed. Appx. 346 (8th Cir. 2014) (per curiam).  The court found no abuse of discretion in the district court's decision to allow S.J. to testify about her family circumstances and history of abuse because the evidence was relevant to why she chose to remain with Nyuon.  Id.  The court found no error in the jury selection process.  Id.  The court found no improper remarks were made by the prosecutor.  Id.  The court held Mr. Nyuon's rights under the Speedy Trial Act were not violated.  Id.  The court also affirmed the district court's denial of Mr. Nyuon's motion to suppress his statements, and held the error, if any, in failing to suppress information from Mr. Nyuon's cell phone was harmless as that information

mirrored the information obtained from S.J.'s cell phone.  Id.  The court also affirmed the sentence imposed by the district court, noting that it was at the low end of the USSG.  Id.  Mr. Nyuon's request for rehearing, and request for rehearing *en banc* was denied on January 28, 2015.  See CR Docket No. 405.

### D.    Mr. Nyuon's § 2255 Motion

Mr. Nyuon timely filed with this court his motion to vacate, set aside or correct his sentence on January 19, 2016.  See Docket No. 1.  In his motion, and the amendment to the motion, Mr. Nyuon urges four grounds for relief, all asserting ineffective assistance of his trial counsel:

1.    trial counsel was ineffective because he failed to raise on appeal the issue of the sufficiency of the evidence and failed to protect Mr. Nyuon's liberty interests on appeal;

2.    trial counsel was ineffective by failing to properly investigate Mr. Nyuon's case and failing to properly prepare for trial in that exculpatory evidence was not presented at trial and government witnesses were not adequately cross-examined;

3.    trial counsel was ineffective because he had a "conflict of interest" in that counsel and Mr. Nyuon disagreed on issues such as witnesses, confronting his accuser, not attacking the sufficiency of the evidence, etc.; and

4.    trial counsel was ineffective for failing to object to the government's lack of proof of any element of interstate commerce.

Id.; Docket 16.

The government now moves to dismiss Mr. Nyuon's motion for failure to state a claim upon which relief can be granted.  See Docket No. 13.  Mr. Nyuon resists the motion.  See Docket Nos. 15 & 16.

## DISCUSSION

### A.    Standard Under Rule 12(b)(6)

The government's motion is made pursuant to Fed. R. Civ. P. 12(b)(6) and

Rule 12 of the Rules Governing Habeas Actions.  These rules allow dismissal of

a pleading if the movant has failed to state a claim upon which relief can be

granted.  Movants must plead "enough facts to state a claim to relief that is

*plausible* on its face."  Atlantic Corp. v. Twombly, 550 U.S. 544, 570

(2007)(emphasis added).

Under Federal Rule of Civil Procedure 8(a)(2), a movant must plead only

"a short and plain statement of the claim showing that the pleader is entitled to

relief."  Id. at 554-55 (quoting FED. R. CIV. P. 8(a)(2)).  A complaint does not

need "detailed factual allegations" to survive a motion to dismiss, but a

[movant] must provide the grounds for his entitlement to relief and cannot

merely recite the elements of his cause of action.  Id. at 555 (citing Papasan v.

Allain, 478 U.S. 265, 286 (1986)).  There is also a "plausibility standard" which

"requires a complaint with enough factual matter (taken as true)" to support

the conclusion that the [movant] has a valid claim.  Id. at 556.  The movant's

motion must contain sufficiently specific factual allegations in order to cross

the line between "possibility" and "plausibility" of entitlement to relief.  Id.

There are two "working principles" that apply to Rule 12(b)(6) motions.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  First, courts are not required to

accept as true legal conclusions "couched as factual allegation[s]" contained in

a motion.  Id. (citing Papasan, 478 U.S. at 286).  "Threadbare recitals of the

31

elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (quoting Twombly, 550 U.S. at 555). Rule 8 "does not unlock the doors of discovery for a [movant] armed with nothing more than conclusions." Iqbal, 556 U.S. at 678-79.

Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679 (quoting decision below Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)). Where the movant's allegations are merely conclusory, the court may not infer more than the mere possibility of misconduct, and the complaint has alleged–but has not "show[n]"–that he is entitled to relief as required by Rule 8(a)(2). Iqbal, 556 U.S. at 679 (emphasis added).

The Court explained that a reviewing court should begin by identifying statements in the motion that are conclusory and therefore not entitled to the presumption of truth. Id. at 679-680. Legal conclusions must be supported by factual allegations demonstrating the grounds for a movant's entitlement to relief. Id. at 679; Twombly, 550 U.S. at 555; FED. R. CIV. P. 8(a)(2). A court should assume the truth only of "well-pleaded factual allegations," and then may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. These are the principles guiding the court's evaluation of respondents' motion.

## B.    Scope of a § 2255 Motion

Section 2255 of Title 28 of the United States Code was enacted to supersede habeas corpus practice for federal prisoners. Davis v. United States,

417 U.S. 333, 343-44 (1974).  Prior to the enactment of § 2255, habeas claims had to be brought in the district where the prisoner was confined, resulting in overburdening those districts where federal correctional institutions were located and presented logistical issues because the record in the underlying criminal case were often in a distant location.  United States v. Hayman, 342 U.S. 205, 212-16 (1952).  The enactment of § 2255 resolved these issues by requiring that the motion be filed in the sentencing court.  Id.

The scope of a § 2255 motion is seemingly broader than the scope of a habeas petition, the latter of which is typically limited to allegations of a constitutional dimension.  Section 2255 allows a federal prisoner to "vacate, set aside or correct" a federal sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  See 28 U.S.C. § 2255.  Where the allegation for relief is *not* based on a violation of a Constitutional or federal statutory right or an assertion that the court was without jurisdiction, the Supreme Court has read a "fundamentality" requirement into § 2255–relief is available for only those errors which constitute a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."  Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999).

Mr. Nyuon's § 2255 motion is premised on an asserted violation of his Sixth Amendment right to effective assistance of counsel.

Generally, petitioners are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal.  United States v. Frady, 456 U.S. 152, 167-68 (1982); McNeal v. United States, 249 F.3d 747, 749 (8th Cir. 2001).  When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either:  (1) actual innocence or (2) that the procedural default should be excused because there was both cause for the default and actual prejudice to the petitioner.  Bousley v. United States, 523 U.S. 614, 621-22 (1998); McNeal, 249 F.3d at 749.  Therefore, barring a claim of actual innocence, a petitioner must show both cause for why he failed to raise an issue on direct appeal as well as actual prejudice caused by the alleged errors.

Appellate courts generally refuse to review claims of ineffective assistance of counsel on direct appeal; such claims are, therefore, properly addressed in a 28 U.S.C. § 2255 motion such as the one here.  See United States v. Lee, 374 F.3d 637, 654 (8th Cir. 2004) (ineffective assistance of counsel claims are not generally cognizable on direct appeal and will be heard only to prevent a miscarriage of justice or in cases where the district court has developed a record on the issue).  Therefore, no procedural default analysis is required before examining a movant's claims of constitutionally-deficient counsel.

**C.    Sixth Amendment Right to Effective Assistance of Counsel**

**1.    <u>Strickland</u>**

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel.  The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.' " <u>Strickland v. Washington</u>, 466 U.S. 668, 698 (1984) (citing <u>McMann v. Richardson</u>, 397 U.S. 759, 771, n.14 (1970)).  <u>Strickland</u> is the benchmark case for determining if counsel's assistance was so defective as to violate a criminal defendant's Sixth Amendment rights and require reversal of a conviction.  <u>Id.</u> at 687.  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."  <u>Id.</u> at 687-688.  The defendant must also show that counsel's unreasonable errors or deficiencies prejudiced the defense and affected the judgment.  <u>Id.</u> at 691.  The defendant must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  <u>Id.</u> at 695.  In sum, a defendant must satisfy the following two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002). It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." Id. Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct. Strickland, 466 U.S. at 698.

### 2.    Ineffective Assistance On Appeal

Mr. Nyuon alleges his counsel was ineffective on appeal because he failed to raise the issue of the sufficiency of the evidence [in support of the jury verdict] and he failed to protect Mr. Nyuon's liberty interests on appeal. The court will not consider these arguments because Mr. Nyuon was his own counsel on appeal. Any errors or omissions committed were his own.

Mr. Eirinberg filed the notice of appeal on Mr. Nyuon's behalf on July 19, 2013. See CR Docket No. 225. That document did not set forth or limit the issues which could be raised on Mr. Nyuon's behalf on appeal. Id.

After the notice of appeal was filed, the Eighth Circuit issued a briefing schedule. Then, on September 17, 2013, Mr. Nyuon filed a motion for appointment of new counsel. The Eighth Circuit denied that motion on September 20, 2013. The court granted several extensions for trial transcripts

to be prepared and for Mr. Nyuon's first brief to be filed. Then on October 3, 2013, Mr. Nyuon filed a motion asking to be allowed to represent himself on his appeal. That motion was denied October 7. Mr. Nyuon persisted, filing a motion to terminate Mr. Eirinberg on October 10.

The transcripts and exhibits from the district court were filed with the Eighth Circuit on November 6, 2013. Mr. Eirinberg filed a brief on behalf of Mr. Nyuon on December 18, 2013. On December 26, 2013, Mr. Eirinberg filed a motion to withdraw as appointed counsel along with a motion to allow Mr. Nyuon to file his own *pro se* supplemental brief. That motion was granted. Mr. Nyuon thereafter filed a 53-page *pro se* appellate brief on June 6, 2014 (after the court granted him numerous extensions). The government filed its appellee brief on July 17, 2014. Mr. Nyuon filed a 34-page *pro se* reply brief on September 22, 2014.

Mr. Eirinberg raised two issues in his initial appellate brief: (1) whether Mr. Nyuon's due process rights were violated by the admission of evidence about S.J.'s family life and (2) whether Mr. Nyuon's sentence was substantively unreasonable. Mr. Nyuon in his own initial appellate brief raised six issues: (1) whether Mr. Nyuon's due process rights were violated by the admission of inapplicable, inflammatory, and irrelevant testimony; (2) whether Mr. Nyuon's constitutional right to a fair and impartial jury was violated because the jury was not a representative cross-section of the community; (3) whether Mr. Nyuon's Speedy Trial Act rights were violated; (4) whether the government's misconduct during voir dire caused reversible error; (5) whether Mr. Nyuon's

Fourth Amendment rights were violated by the search of his cell phone; and (6) whether Mr. Nyuon's Fifth Amendment rights were violated by his interrogation.

The Eighth Circuit addressed the issues Mr. Nyuon raised in his own *pro se* appellate brief.  See Nyuon, 587 Fed. Appx. 346-47.  If Mr. Nyuon wanted to raise the issue of whether the evidence was sufficient to support the jury's verdict, he could have done so himself.  That the issue was not raised is Mr. Nyuon's fault, not Mr. Eirinberg's.

Finally, even if Mr. Eirinberg had handled Mr. Nyuon's appeal instead of Mr. Nyuon handling it himself, he has failed to state a claim.  "The Sixth Amendment does not require that counsel raise every colorable or non-frivolous claim on appeal."  New v. United States 652 F.3d 949, 953 (8th Cir. 2011) (citing Roe v. Delo, 160 F.3d 416, 418 (8th Cir. 1998)).  " '[A]bsent contrary evidence, we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy.' "  Id. (quoting United States v. Brown, 528 F.3d 1030, 1033 (8th Cir. 2008)).

Failure of appellate counsel to raise a sufficiency-of-the-evidence argument on appeal is an especially high hurdle to clear for Mr. Nyuon.  "There were sound reasons . . . to omit a challenge to the sufficiency of the evidence. A defendant challenging the sufficiency of the evidence supporting his convictions faces a high bar.  We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the jury's verdict, and we will reverse only if no reasonable jury could have found the defendant guilty

beyond a reasonable doubt." <u>New</u>, 652 F.3d at 953-54 (citing <u>United States v. Birdine</u>, 515 F.3d 842, 844 (8th Cir. 2008)).

Here, had Mr. Eirinberg raised a sufficiency-of-the-evidence argument (or, more properly, had Mr. Nyuon raised it, since he handled his appeal himself), the argument would almost certainly have been rejected by the appellate court. The evidence of Mr. Nyuon's guilt at trial was more than adequate to sustain the jury's verdict. He was caught red-handed in the sting operation. He admitted immediately after the sting to Agent Aramayo that he gave S.J. a ride to the hotel, knowing she was meeting a prostitution client and that he expected to receive money from S.J. in return. His credit card and his email account were used to set up at least three of the Backpage.com ads. And his text messages to S.J. regarding the details of the sex trafficking activity proved his involvement in and knowledge of the crime. Finally, at least two other women testified to having become victims of Mr. Nyuon's sex trafficking activities. The court recommends denying Mr. Nyuon's § 2255 motion on the grounds that errors were made on appeal.

### 3.    Ineffective Assistance at Trial

Mr. Nyuon asserts Mr. Eirinberg was ineffective in trying his case to a jury because Mr. Eirinberg allegedly failed to properly investigate, failed to properly prepare for trial by presenting exculpatory evidence and by being ready to cross-examine government witnesses. <u>See</u> Docket No. 1 at p. 4. In his memorandum, Mr. Nyuon asserts Mr. Eirinberg should have interviewed and called as witnesses at trial Miranda Siechclaw and "D.A." <u>See</u> Docket No. 2 at

39

p. 4.  However, Mr. Nyuon never states what these two witnesses would have testified to had they been called at trial.  <u>See</u> Docket No. 2.  He states generally they would have testified that S.J. lied about her age and prior acts of prostitution.  <u>Id.</u> at p. 4.  He also states these "witnesses would have (1) clarified many of the issues that needed to be clarified, (2) would have permitted counsel to make his own assessment of the witnesses [sic] demeanor and credibility, (3) would possibly have allowed counsel to discover additional favorable evidence for petitioner, and (4) would have allowed counsel to be more effective in his cross-examination of witnesses put forth by the government."  <u>Id.</u> at p. 5.  Finally, had these witnesses been called, Mr. Nyuon asserted their testimony "would have rebutted the government's case."  <u>Id.</u>

First, as to the assertion that these two witnesses would have testified S.J. lied about her age, such testimony would merely have been cumulative. Mr. Eirinberg called three defense witnesses who all testified that S.J. lied to them and said she was 18 years old or older.  <u>See</u> CR Docket No. 214 at pp. 128-29, 140, and 151.   In addition, the government called Amber Traversie and Nikki Track, who both also testified S.J. told them she was over 18.  <u>Id.</u> at p. 69; CR Docket No. 214 at pp. 10-12.  Finally, S.J. herself testified she lied about her age to others, lied about her age specifically to Mr. Nyuon, and lied about her age on the Backpage.com ad that she herself placed.  <u>See</u> CR Docket No. 213 at pp. 149-51, 196, and 199.  Additional testimony from two more witnesses establishing that S.J. lied about her age would not have changed the outcome of the trial.  The jury already had this evidence before them.  <u>See</u>

40

Bucklew v. Luebbers, 436 F.3d 1010, 1020 (8th Cir. 2006) (no Strickland prejudice where uncalled witnesses' testimony would merely have been cumulative of other evidence already before the jury).

Furthermore, the government did not have to prove Mr. Nyuon knew S.J.'s age; it only had to prove that Nyuon had a reasonable opportunity to observe S.J. See 18 U.S.C. § 1591(c); United States v. Mozie, 752 F.3d 1271, 1283-84 (11th Cir. 2014). S.J. testified that she lived with Mr. Nyuon in various hotels for a substantial period of time while she was performing commercial sex acts for him. Thus, there was ample evidence in the record that Mr. Nyuon had a reasonable opportunity to observe S.J. Even if the jury believed that S.J. lied about her age—she clearly did so—it could convict Mr. Nyuon on the reasonable-opportunity-to-observe prong of the statute. The jury also had a chance to observe S.J. and her apparent age first-hand when she testified—she was 15 at the time of the trial. Finally, the jury was also given a photograph of S.J. from the time the crimes had been committed, allowing the jury to observe her appearance at that time. Calling two additional witnesses to show S.J. lied about her age—a fact she herself admitted—would not have changed the outcome of the trial.

Likewise, testimony that S.J. had previously engaged in prostitution would not have changed the outcome of the trial. As discussed above in regard to the sufficiency-of-the-evidence appellate issue, the evidence of Mr. Nyuon's guilt at trial was more than adequate to support the jury's verdict of guilt. Evidence that S.J. had engaged in prostitution before, on her own or under the

control of a pimp, would not have changed that verdict.  In this regard, the
court notes that the jury did have evidence that S.J. herself placed one of the
prostitution ads which police found on Backpage.com, so evidence that she
engaged in prostitution was already before the jury.  See CR Docket No. 213 at
p. 149-51, 199.  In addition, S.J. testified at trial she told the police that she
engaged in prostitution for herself, that no one made her do it.  Id. at pp. 196-
97.  Finally, S.J. told the jury she was in a sexual relationship with another
man at the same time she was in a relationship with Mr. Nyuon.  Id. at p. 200.
As with the previous issue, testimony that S.J. was engaged in prostitution
previously would not likely have changed the outcome of the trial.  Bucklew,
436 F.3d at 1020.

The four numbered items setting forth what the two uncalled witnesses
would have testified to or how their testimony would have affected the trial are
simply too general and conclusory to state a Strickland claim.  Mr. Nyuon does
not provide affidavits from these witnesses setting forth their purported
testimony; he does not state specific facts their testimony would have
established; he does not even fully identify one of the witnesses, stating only
his or her initials:  "D.A."  He states that their testimony would have "clarified
issues," enabled Mr. Eirinberg to assess credibility, and allowed Mr. Eirinberg
to better cross-examine.  But Mr. Nyuon never gives the court any specifics
about any of this.  Allegations of ineffective assistance of counsel which are
vague and conclusory do not entitle a petitioner to relief.  Bryson v. United
States, 268 F.3d 560, 562 (8th Cir. 2001); Spillers v. Lockhart, 802 F.2d 1007,

1009-10 (8th Cir. 1986).  Mr. Nyuon's allegations are too vague and conclusory to entitle him to relief.

Furthermore, "complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (8th Cir. 2002).  A petitioner basing a Strickland claim on the failure of counsel to call a witness must show not only that the witness' testimony would have been favorable, but also that the witness would have testified at the trial. Id.  "The decision not to call a witness is a 'virtually unchallengeable' decision of trial strategy." United States v. Staples, 410 F.3d 484, 488 (8th Cir. 2005).  With no specifics, Mr. Nyuon has not established facts which are necessary to support his claim.

Mr. Nyuon makes much of the fact that at trial, Mr. Eirinberg, on several occasions, asked for a short break before cross-examining a government witness, a practice that eventually earned him the district court's admonishment.  This, alone, does not establish either deficient performance or prejudice.  Every lawyer, if he or she could get it without incurring the ire of the judge, would appreciate having additional time to prepare for a cross-examination.  Mr. Nyuon does not point to anything substantive in Mr. Eirinberg's cross-examinations of government witnesses that was omitted.  To the contrary, Mr. Eirinberg's cross-examinations of S.J., Amber, and Agent Aramayo in particular were effective in eliciting information helpful to

Mr. Nyuon.[2]  In addition, at least at one point the government attorney was unprepared for his own witness's testimony and had to ask for a brief recess. See CR Docket No. 213 at p. 83.  The court concludes that Mr. Nyuon has not shown facts which, if true, would entitle him to relief.  Accordingly, the court recommends this ground for § 2255 relief be denied.

### 4.    Ineffective Assistance at Sentencing

Mr. Nyuon does not set forth sentencing as a separate area of ineffective assistance in his motion or amended motion.  However, in his memorandum in support of the motion, he alleges Mr. Eirinberg was ineffective for failing to argue at sentencing that it was illegal to apply the USSG enhancement for use of a computer and for having sex with a minor victim.  See Docket No. 2 at p. 6. The court addresses this argument.

Where an objection to a PSR, if it had been made and sustained, yields the same potential sentence under the USSG, a petitioner under § 2255 cannot establish Strickland prejudice as a matter of law based on the petitioner's lawyer's failure to assert the objection.  See Montanye v. United States, 77 F.3d 226, 230-231 (8th Cir. 1996) (where the petitioner was sentenced to 360 months incarceration, and the Guidelines range was 360 months to life under the PSR as written, but also the same range if the objection had been made and sustained, petitioner could not show prejudice).

---

[2] The court notes that the prosecutor in Mr. Nyuon's trial also earned an admonishment from the district court on the subject of his repeated infraction of the rule against asking leading questions of a lawyer's own witness, including a mini-lesson on how not to ask leading questions.

However, where counsel failed to make objections to a PSR and it cannot be determined as a matter of law that those objections would not have affected the petitioner's sentence, a question of fact is created which necessitates an evidentiary hearing. See West v. United States, 994 F.2d 510, 513 (8th Cir. 1993) (evidentiary hearing required on petitioner's § 2255 motion where petitioner alleged ineffective assistance of counsel for failure to object to PSR and it could not be conclusively determined from the record that the objections would have had no effect on the petitioner's sentence); United States v. Ford, 918 F.2d 1343, 1350 (8th Cir. 1990) (holding that defendant in direct appeal established ineffective assistance of counsel where counsel failed to object to the fact that the PSR did not give him credit for acceptance of responsibility and, had defendant received such credit, his sentencing range under the Guidelines would have been different).[3]

Here, the PSR found the crime of sex trafficking of a child had a base offense level of 34. See PSR at p. 9-10. Mr. Eirinberg objected to this base offense level, arguing that it should be 30 instead of 34. See CR Docket No. 302 at pp. 13-15. Mr. Eirinberg alleged the jury was instructed that it could find Mr. Nyuon guilty of *either* sex trafficking with a victim under 18

_____

[3]The court recognizes that Montanye, West, and Ford all pre-date the Court's decision in Booker, which made the USSG advisory only. See United States v. Booker, 543 U.S. 220, 245 (2005). However, even though the USSG are now only advisory, the sentencing court is still required to calculate a defendant's sentencing range under the USSG and give "serious consideration" to the USSG range before analyzing the factors under 18 U.S.C. § 3553. Gall v. United States, 552 U.S. 38, 46 (2007). Hence, this court concludes that the Montanye, West, and Ford cases remain viable precedent for collateral proceedings in a post-Booker world.

years of age, *or* of sex trafficking using fraud, force or coercion. Id. at p. 13. Only the former carried with it a base offense level of 34; the latter carried with it a base offense level of 30. Id. at 13-15. Since the jury was not given a special interrogatory, the verdict was only a general verdict. Id. Accordingly, Mr. Eirinberg argued under the newly-decided case of <u>Alleyne v. United States</u>, 570 U.S. ___, 133 S. Ct. 2151 (2013), the court had to apply the USSG using the crime with the lesser base offense level. Id. The court agreed and sustained Mr. Eirinberg's objection, thus making the base offense level 30, not 34. Id. at 15.

There was a two-level increase for the specific offense characteristic of use of a computer or an interactive computer service to entice, encourage, offer, or solicit a person to engage in a prohibited sexual conduct with a minor. Id. at p. 10 at ¶31 (relying on USSG 2G1.3(b)(2)(B)). The PSR relied upon Mr. Nyuon's placing of a prostitution ad on Backpage.com using S.J.'s photographs and phone number to support this increase. Id. The PSR also relied on Mr. Nyuon's reliance on email and text messaging from S.J. to him of those same photos. Id. This enhancement was clearly warranted by the evidence adduced at trial.

Moreover, Mr. Eirinberg *did* object to this enhancement under the USSG. See CR Docket No. 302 at pp. 18-19. The court overruled his objection. Id. at pp. 19-20. Mr. Eirinberg was not, therefore, ineffective for failing to object to the increase because he *did* object.

46

Mr. Nyuon says Mr. Eirinberg should have objected to the USSG enhancement based on him having sex with S.J. There are two paragraphs in the PSR to which Mr. Nyuon may be referring, so the court addresses both paragraphs.

The PSR applied a two-level increase pursuant to USSG § 2G1.3(b)(4)(A) because the offense involved the commission of a sex act or sexual contact. See PSR at ¶ 33. The PSR noted that S.J. performed numerous commercial sex acts for the defendant over a period of approximately two months. Id. Again, this enhancement was clearly warranted. This USSG provision did not require proof that S.J. had sex *with* Mr. Nyuon, only that the offense involved the actual commission of a sex act or sexual contact. Id. S.J.'s testimony about having sex with prostitution customers satisfied this element.

Furthermore, Mr. Eirinberg *did* object to the increase. See CR Docket No. 302 at p. 20. The district court overruled the objection, finding S.J. credible and finding she testified to having sex with Mr. Nyuon and with prostitution clients. Id. The district court overruled the objection, finding S.J. credible and finding her testimony established two or more separate occasions of prohibited sexual contact, both with Mr. Nyuon and with prostitution clients. See CR Docket No. 302 at pp. 28-29.

The other paragraph of the PSR applying an enhancement on the basis that Mr. Nyuon had sex with S.J. was paragraph 38. See PSR at p. 10, ¶ 38. That paragraph applied USSG § 4B1.5(b)(1) to increase the base offense level

by five levels if the defendant engaged in a pattern of activity involving prohibited sexual contact.  Id.

Again, Mr. Eirinberg *did* object to this portion of the PSR.  See CR Docket No. 302 at p. 27.  The district court overruled the objection, again relying on S.J.'s trial testimony and finding S.J. to be credible.  Id. at p. 28.  The court noted § 4B1.5(b)(1) required facts showing that Mr. Nyuon on at least two separate occasions had sexual activity with a minor, or caused a minor to engage in sexual activity.  Id. (citing United States v. Fleetwood, [2012 WL 653854] 457 Fed. Appx. 591 (8th Cir., March 1, 2012)).  The PSR identified multiple occasions on which S.J. had sex with prostitution customers and several occasions on which S.J. had sex with Mr. Nyuon.  Id. at p. 29.  Either would support the enhancement.  Id.  The court overruled the objection.

Mr. Nyuon cannot prove Mr. Eirinberg was ineffective for failing to object to the two identified enhancements under the USSG.  Every enhancement Mr. Nyuon says should have been objected to *was* in fact objected to.  The court recommends denying relief on this ground.

### 5.    Ineffective Assistance Due to Disagreements

Mr. Nyuon alleges Mr. Eirinberg was ineffective because he and Mr. Nyuon "disagreed on issues such as witnesses, confronting his accuser, not attacking the sufficiency of the evidence, etc."  "A habeas corpus petitioner, alleging ineffective assistance of counsel, must show that a particular act or omission fell below the standard acceptable for attorneys in the same or similar circumstances."  Beard v. Lockhart, 779 F.2d 23, 26 (8th Cir. 1985) (citing

Strickland, 466 U.S. at 693).  A general allegation, such as that counsel was

not "fighting" the defendant's case properly, is insufficient to warrant habeas

relief.  Id.  A general allegation that counsel had a "conflict of interest" is also

insufficient to entitle one to relief under § 2255.  Kindle v. United States, 46

F.3d 1136 (8th Cir. 1995) (table, unpub'd).  The petitioner must allege specific

facts tending to prove an actual conflict of interest; conclusory allegations will

not suffice.  Id.  Here, all Mr. Nyuon supplies are conclusory allegations.  This

is not enough to survive a Rule 12(b)(6) motion to dismiss.

### 6.    Ineffective Assistance for Failure to Object to Elements

Mr. Nyuon's final claim of ineffective assistance of counsel is contained in

his amendment to his motion, filed July 18, 2016.  See Docket No. 16.  In that

amendment, he claims Mr. Eirinberg was ineffective because he failed to raise

the argument that "the government never fulfilled the preliminary steps to have

him found to be a sex trafficker under the statute he [sic] for which he was

prosecuted." Id. at p. 1.  Specifically, Mr. Nyuon argues that the crime of sex

trafficking requires some element of interstate commerce.  Id. at p. 2.  Since his

crime involving S.J. occurred solely within the city of Sioux Falls, South

Dakota, he argues he committed a "purely local crime" which should have been

left to local, not federal, authorities to prosecute.  Id.

The district court instructed the jury that to find Mr. Nyuon guilty of the

crime of sex trafficking of a child, the government would have to prove the

following element, among others, beyond a reasonable doubt:

**that Nyuon's actions were in or affecting interstate commerce.**

The term "commerce" includes, among other things, travel, trade, transportation, and communication.  The internet is an instrumentality and channel of interstate commerce.

The phrase "interstate commerce" means commerce between any combination of states, territories, and possessions of the United States, including the District of Columbia.

See CR Docket No. 194 at p. 5.  There was evidence introduced at trial that Mr. Nyuon advertised S.J. for the purposes of prostitution on the internet, that is, on Backpage.com.  That clearly satisfies the element of interstate commerce. The ad Mr. Nyuon placed on Backpage.com was accessible by anyone with an internet connection, not just by persons living in Sioux Falls.

Mr. Nyuon's argument that his crime was "purely local" is not sustainable given the evidence introduced at trial.  Had Mr. Eirinberg raised this argument, before, during or after trial, it would not have been granted. Whether the government proved the element of interstate commerce was up to the jury to decide.  The jury was properly instructed.  The evidence in the record supported the jury's finding.  Mr. Eirinberg was not deficient for failing to raise this argument.  Even if he were, Mr. Nyuon cannot prove prejudice for failing to raise it because the argument would not have succeeded.

Mr. Nyuon cites Bond v. United States, 564 U.S. 211 (2011), in support of his assertion that there was no interstate commerce element to his crime. The Bond decision does not stand for that proposition.  The Bond Court merely decided whether a criminal defendant had standing to raise a Tenth Amendment challenge to a criminal prosecution in federal court; the Court very

50

specifically refused to express any opinion as to whether there was any merit to the substance of the criminal defendant's constitutional argument. <u>Bond</u>, 564 U.S. at 226. The court recommends denying this ground for relief in Mr. Nyuon's § 2255 motion.

## C.   No Evidentiary Hearing is Warranted

A § 2255 motion can be denied without holding an evidentiary hearing if (1) the movant's allegations, even if true, would not entitle him to relief; or (2) the movant's allegations cannot be taken as true because they are contradicted by the record, they are inherently incredible, or they are conclusions rather than factual statements. <u>Hyles v. United States</u>, 754 F.3d 530, 534 (8th Cir. 2014). "If [the court] can determine from the motion and the supporting record in the case that [the movant] is not entitled to § 2255 relief, then no hearing was, or is now, required." <u>Saunders v. United States</u>, 236 F.3d 950, 952 (8th Cir. 2001).

Here, the court concludes that no evidentiary hearing is warranted. Even assuming Mr. Eirinberg was deficient in any respect, Mr. Nyuon has failed to demonstrate prejudice. There is no issue of fact or credibility to be determined by holding an evidentiary hearing. Therefore, the court recommends no such hearing be held.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends that the government's motion to dismiss [Docket

No. 13] be granted and that Mr. Nyuon's motion to vacate, set aside, or correct [Docket Nos. 1 & 16] be denied.

### NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED September 6, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge